REGAN, Judge.
Plaintiff, Annie Bell Carter, employed as a “kitchen helper”, instituted this suit against her former employers, the defendants, Karl and Katy Dinkeldein [1] and their insurer, New Amsterdam Casualty Company, endeavoring to recover workmen’s compensation at the rate of $19.50 per week for a period of 400 weeks, 'together with medical expenses, attorney’s fees and penalties, for total and permanent disability resulting from an injury to her back which she asserted was incurred on November 10, 1958, when she fell from a chair while cleaning windows of a kitchen door, located in the establishment of her employers.
Defendants answered and denied that an accident occurred, or if it did occur, that plaintiff did not incur any compensable disability as a result thereof; they insisted that the complaints relating to her back were caused by her pregnant condition, which had not been aggravated or accelerated by her employment.
From a judgment in favor of the defendants dismissing plaintiff’s suit, she has prosecuted this appeal.
The record reveals that the plaintiff, a 24-year old obese Negro woman, about three months pregnant, had been employed as a kitchen helper at The Four Seasons, a pastry and coffee house, for less than two weeks when the alleged accident occurred. Her hours of employment were from 5 :30 p. m. to 12:30 a. m., and her duties consisted of washing dishes, mopping, sweeping and other related activities.
Plaintiff related that she was directed by Mr. Dinkeldein on Monday, November 10th at about 7:30 p. m. to wash the windows in a kitchen door and to elevate herself, she was to stand on a chair; while she was thus engaged, she fell to the floor, injuring her back. There were no witnesses to the accident. The plaintiff laboriously asserted that she walked to the front of the establishment and told a waitress, Ruby Turner, rather than the cashier-manager, what had occurred. She insisted that'she did not report the accident to Karl Dinkeldein since he was not there, although the. record emphatically shows that either Karl or Katy Dinkeldein were there each evening during the hours of her employment.
She related that she did not see Dinkel-dein the next day, which was a Tuesday, *203 but did tell him on Wednesday that she had fallen. In any event, she continued to work through the week, despite her assertion that she was so afflicted with pain that she did not work on Friday of that week, although the record shows that she was paid through Saturday, and employees were only paid for the hours actually worked.
Late in the afternoon of Monday, November 17th, which was a week after the accident, plaintiff testified that she telephoned the cashier to report that she was unable to work because of an injured back, and the cashier referred the call to Karl Dinkeldein, who instructed her to visit his establishment the following morning in order that he could, in writing, refer her to his insurer’s doctor, Dr. Lyons, which was done.
Ruby Turner, the waitress, related that she did not observe plaintiff washing windows, nor did she see the accident occur, but she did recall that the plaintiff had informed her on or about November 10th that she fell and injured her back. She knew nothing else about the accident.
Karl Dinkeldein testified that on Monday, November 17, 1958, which was a week after the accident, the plaintiff informed him of the occurrence thereof through the medium of a telephone call; however he was told by the plaintiff that the injury occurred on November 14th rather than on the 10th, and he related that “I had to take her word for it because I had no other witnesses on my own behalf to check with”. Dinkeldein related that while the hours spent at his place of business were irregular, that either he or his wife, Katy, were present at The Four Seasons every night; in fact, one or the other made certain that the establishment was properly closed.
Dinkeldein, as we have related herein-above, referred the plaintiff to Dr. John M. Lyons, a general surgeon, who saw her on November 18, 1958. In conformity with her complaints, he tentatively diagnosed her injury as a sprain of’ muscles or ligaments of the lower back. He prescribed as treatment infra-red heat applications to her back. On December 19, 1958, because plaintiff continued to complain, he sent her to Dr. James L. Lenoir, an orthopedist, for an evaluation of these complaints. He suggested hospitalization so as to put her in traction which would permit a more accurate diagnosis of her condition. Dr. Lyons followed Dr. Lenoir’s suggestion in order to afford plaintiff the benefit of his doubt relating to the validity of her complaints. She entered Flint-Goodridge Hospital on December 30th and remained there as a patient until January 8, 1959. Dr. Lyons’ final diagnosis was that the plaintiff’s backache “was largely due to her pregnancy of about five months”. She was discharged by him on January 12, 1959, as fully able to resume her employment; however, he suggested she visit the obstetrics clinic of Charity Hospital for treatment pertaining to her pregnancy, which she did, and a seventh month baby was delivered at Charity Hospital in April of 1959.
Dr. Lenoir, whom we have referred to hereinabove, examined plaintiff on December 19, 1958, clinically and by virtue of the use of the X-ray, and his final diagnosis was that he “finds no evidence of back injury or residuals of back injury at the time of his examination”, and that the''plaintiff was fully capable of resuming her • former occupation.
Dr. Richard H. Corales, Jr., a neurosurgeon, appeared on behalf of the defendants and related that on September 10, 1959,[2] he examined the plaintiff clinically and through the medium of the X-ray and testified at great length in conection with his examination and in the last analysis he was of the opinion that the plaintiff was fully capable of resuming her occupation because he found no abnormality as a result of his examination.
Dr. Blaise Salatich, an orthopedist, appeared on behalf of plaintiff • and related *204 that he had clinically and through the medium of X-rays, examined the plaintiff on July 8, 1959, which was approximately eight months after the occurrence of the accident. He found a persistent disabling low back injury, upon which he elucidated ad infinitum.
He prescribed physiotherapy, muscle relaxants and diathermy and asserted that the plaintiff was still under his treatment at the time of the trial. His medical report was dated August 25, 1959, and he asserted that the plaintiff could not have worked as a kitchen helper as of that date; however, as of the date of the trial,[3] he found her improved and asserted that she should be given the opportunity of trying to work.
Dr. Byron M. Unkauf, an orthopedic surgeon, appeared on behalf of plaintiff and related that he examined her clinically on May 14, 1959, which was six months after the accident and on January 23, 1960, caused X-rays to be taken, which were essentially negative. As of May 14, 1959, he was of the opinion that bending or stooping would cause plaintiff pain. His examination of January 23, 1960, occurred after plaintiff had received treatment from Dr. Salatich and he found that plaintiff’s condition had improved considerably as a result thereof and he therefore concluded that she could return to work in the month .of April 1960.
While plaintiff initially insisted on recovering compensation for total and permanent disability, in the course of oral argument by her counsel before this court, he now concedes that plaintiff is entitled to compensation only from January 12, 1959, through April of 1960.
Defendant, on the other hand, insists that no accident occurred, or if one did occur, the plaintiff did not suffer any com-pensable disability as a result thereof.
The only questions which the pleadings and the evidence have posed for our consideration are ones of fact and they are whether an accident actually occurred on November 10, 1958, and if so, whether plaintiff suffered any compensable disability as a result thereof.
In our opinion the trial judge answered both these questions in the negative and our examination of the record fails to disclose any error in his conclusion. He obviously was of the opinion that the plaintiff had failed to prove the occurrence of an accident with that certainty that the law requires. We say this fully cognizant of jurisprudence to the effect that “the testimony of the plaintiff alone may be sufficient to prove an accident, but this is subject to the condition that there is nothing appearing which impeaches or discredits plaintiff and his testimony is supported by the circumstances”.[4]
We feel that plaintiff’s failure to report this accident to either Katy or Karl Dinkel-dein or the cashier-manager until a week after the alleged accident occurred, taken together with the whole tenor of the plaintiff’s evidence inscribed in the record, some of which taxed our credulity, created suspicious circumstances militating against the occurrence of an accident and we believe these suspicions were ultimately confirmed by the most credible expert medical testimony appearing in the record which negated evidence of injury resulting from this accident.
However, assuming arguendo that an accident occurred on November 10, 1958, we are then of the opinion that the plaintiff incurred no compensable disability as a result thereof, which is also substantiated by the expert medical testimony adduced on behalf of the defendants which we have referred to hereinabove.
To reiterate, we are of the opinion that no accident occurred, but if one did occur, *205 it produced no compensable disability as a result thereof.
The legal philosophy which has permeated our jurisprudence with liberal rules of evidence and procedure applicable to compensation cases does not apply to proof that an accident occurred, or if it did occur, that it caused the disability.
Plaintiff must, therefore, establish her case by a preponderance of competent evidence as in any other civil suit. This, in our opinion, she has failed to do.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.

. A partnership conducting its business under the trade name of The Four Seasons.

. This was during the time that she was being treated by Dr. Salatich.

. February 16, 1960,

. Fouchea v. Maloney Trucking & Storage, Inc., 1959, 108 So.2d 273 at page 274.